[No. 1250.]

T. J. WOOD *v.* THE STATE.

PRACTICE—VERDICT.—A jury in a murder trial, having determined upon a verdict of murder in the second degree, disagreed upon the term of imprisonment to be imposed as penalty, and finally agreed that each member should write upon a strip of paper a number not less than five nor more than fifty, to represent the number of years he favored, the whole number to be added together and then divided by twelve, and the quotient to be the verdict of the entire jury. *Held,* that, while such may not be strictly a verdict reached by lot, it was not a verdict reached by a fair expression of the opinion of each juror who tried the case, and hence is error.

APPEAL from the District Court of Hunt. Tried below before the Hon. G. J. Clark.

The indictment charged the appellant with the murder of Jacob Forgatson, in Hunt county, Texas, on the first day of July, 1882. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at imprisonment in the penitentiary for a term of forty-six years and three months.

In substance, the testimony of Frank Newman, the principal witness for the State, was that he went into the store of the deceased between ten and eleven o'clock on the night of the killing. The deceased was then up stairs. Some parties, including the defendant, came in and asked the witness to wind up a music box, and play two or three tunes, which he did, and the party went out. The defendant returned again shortly and asked for a match, which he obtained and left again. Presently the deceased came down stairs and said, "we are going to close up." The witness assisted him in closing two doors. The defendant came in as the east door was being closed, and the deceased said "I close up now." The deceased went to the west door to close it, and the defendant stepped up to him and said "Are you going to treat now?" The deceased asked, "What for?" The defendant replied, "You said you were going to treat." The deceased replied, "I said no such thing." The defendant said, "You are a d—d liar." Forgatson replied, "Young

man, you had better behave yourself," and the defendant there-
upon shot the deceased through the head. The witness was
standing immediately behind the deceased, and was so near that
his own face was powder-burned.

The defendant ran immediately, and the witness followed,
hallooing for the police and calling on parties to arrest the de-
fendant for "shooting Forgatson," and pressed the chase until
the defendant was arrested. This witness stated that, at the
time of the shooting, the deceased had a stick in his hand, about
three feet long, in one end of which he had driven a nail with
which to pull down the upper "catch" of the store doors. This
stick was about the width and thickness of a lath used by plas-
terers. The deceased made no demonstration with it, or the
witness would certainly have seen it. He made no other demon-
stration. He, deceased, did not use the expression, "knock the
d—d drunken son of a b—h's head off," nor did he make other
remark than that stated. The defendant at no time asked the
deceased, "Are you not the man who went to the pool with us?"

A policeman testified, for the State, that, being called upon by
Newman, he followed, overtook and arrested the defendant.
He had a pistol in his hands when arrested.

The substance of the testimony of Charles Armer, for the
State, was that he was standing at the corner of the Schiff
building (in which the deceased did business), and saw a man
step out of the corner door of that building and walk to the
west door. As one-half of the west door closed, the man stepped
in and fired, and ran out followed by Newman calling for police.
Not a word was spoken that the witness heard.

Several witnesses, introduced for the defense, testified point-
blank that the State's witness, Armer, was with them in an up-
stairs gambling room, in the rear of a drinking saloon, when
the shooting took place.

The substance of the lengthy narratives of the two principal
witnesses for the defense was, that while they, the defendant
and others, were arranging on that evening to go on a hand car
to the railroad pool, some little distance up the road, to bathe,
the deceased proposed to join them and did so. On their return
after bathing the defendant remarked to the deceased as they
passed a saloon: "Since we did not help pump the hand car we
should treat the boys." The deceased said "not now," and went
on to his store, and the party went into the saloon. They gave
an account of their own movements and those of the defendant

subsequent to this, and finally located themselves at the corner of the Schiff building, at which time the deceased stepped to the door, of which one half was open, and placed one hand on the door-facing and the other on the closed door, and asked the deceased, who was standing there with a stick: "Hadn't we better treat the boys now?" The deceased asked, "What boys?" The defendant asked: "Are you not the man who went with us to the tank?" The deceased said: "Yes, but what has that got to do with treating the boys?" The defendant then asked him; "Didn't we agree to treat the boys?" to which the deceased answered, "no," and the the defendant said, "you are a d—d liar." The deceased then said: "You had better mind, young man! What's that you called me? Do you call me a d—d liar?" and seized the defendant by the collar with his left hand. The defendant placed his hand on his pistol and said "yes," where-upon the deceased released his collar and struck him in the face with his left hand, and with his right raised the stick in a striking attitude, when the defendant fired and ran, followed by Newman calling for the police. One of these witnesses stated that just about the time the pistol fired he heard the deceased say: "You d—d drunken son of a b—h, I'll knock your drunken head off."

To the principal witness for the prosecution the defendant appeared sober at the time, and according to those for the defense he was somewhat in liquor. To some witnesses for the defense the State's witness Newman felt the effects of too much beer, and to many others he was apparently quite sober, though somewhat excited.

The motion for new trial was based upon alleged error in the charge of the court, on the refusal of a continuance and change of venue, and upon the ground that the verdict was contrary to law and evidence.

*King & Foster*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J. T. J. Wood, the appellant, was convicted of murder of the second degree, his punishment being assessed at confinement in the penitentiary for the term of forty-six years and three months.

There is but one matter requiring discussion, as the other supposed error will not recur upon a new trial. By affidavits of

jurors who tried the case, it appears that the jury agreed upon the guilt of the defendant, but were not agreed upon the punishment. In order to determine the length of time that should be imposed, they agreed that "each should put down any number of years not to exceed fifty, and not less than five, add the numbers together and divide by twelve, the quotient being the punishment." They also agreed, before the numbers were set down, to abide the result. Eleven put down fifty, and one five years. By addition and division the quotient is forty-six years and three months, the amount of the verdict. This verdict was returned into court, and each juror stated that it was his verdict.

To this process, by which his punishment was ascertained, the defendant objected, and urged his objection in his motion for new trial. The court overruled his motion, and defendant urges this matter as a ground for reversal.

Did the court err in overruling the motion? We think so. The Code of Criminal Procedure provides that new trials in cases of felony shall be granted, "where the verdict has been decided by lot, or in any other manner than by a free expression of opinion of the jurors." This verdict may not have been reached by lot, but was it a fair expression of opinion of each juror who tried the defendant?

It will be observed that in the case before us the jurors agreed before the amount was ascertained, that they would abide by the result. This is fatal to the verdict. "A jury may ascertain what the amount will be, and if the amounts produced gives satisfaction, they may return it as their verdict." But they cannot agree before the amount is ascertained that they will abide by it; and if they do, it is error for which a new trial will be granted. (*Harvey* v. *James*, 3 Humph., 157; *Leverett* v. *The State*, 3 Texas Ct. App., 213; *Baker* v. *Bennett*, 3 Humph., 160.)

"The impropriety consists in the agreement to be bound by the result." (*Dorr* v. *Fenno*, 12 Pick., 521.) Nor will the fact that each juror, when the verdict was returned, stated that it was his verdict, cure or heal the matter. In felony cases the citizen's life, liberty and character being at stake, the verdict of the jury should be the result of reason, deliberation, and honest conviction, and not the offspring of chance, accident or any agreement which hampers or embarrasses a juror in a free expression of opinion. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 8, 1882.